352 F.2d 672
 122 U.S.App.D.C. 196
 HOLIDAY TOURS, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
A.B. & W. Transit Company, The Gray Line, Inc., Washington,
Virginia & Maryland Coach Company, Inc., of Arlington,
Virginia, D.C. Transit System, Inc., of Washington, D.C., Intervenors.
 No. 18561.
 United States Court of Appeals District of Columbia Circuit.
 Argued Jan. 7, 1965.
Decided July 14, 1965.
 
 Mr. Leonard A. Jaskiewicz, Washington, D.C., with whom Mr. J. William Cain, Washington, D.C., was on the brief, for petitioner. Mr. Louis M. Kaplan, Washington, D.C., also entered an appearance for petitioner.
 Mr. Russell W. Cunningham, Arlington, Va., for respondent.
 Mr. S. Harrison Kahn, Washington, D.C., who was on the brief for intervenors A.B. & W. Transit Co. and Gray Line, Inc., argued for all intervenors.
 Messrs. John R. Sims, Jr., Harold Smith, and Gordon Allison Phillips, Washington, D.C., were on the brief for intervenor D.C. Transit System, Inc., of Washington, D.C.
 Mr. Manuel J. Davis, Washington, D.C., was on the brief for intervenor Washington, Virginia & Maryland Coach Co., Inc., of Arlington, Virginia.
 Before WASHINGTON, BURGER and WRIGHT, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 Holidays Tours, Inc., seeks review of two orders of the Washington Area Transit Commission denying, initially and on reconsideration, its application for a certificate of public convenience and necessity, based on 'grandfather' rights, under Article XII, Section 4(a) of the Washington Metropolitan Area Transit Regulation Compact, Pub.L. 86-794, 74 STAT. 1031, 1037 (1960).[1] Its application asked for authority to transport
 
 
 2
 'Passengers and their baggage in special operations in round trip sightseeing or pleasure tours and in charter operations'
 
 
 3
 between specified points in the Washington metropolitan area. If the applicant was bona fide engaged in this kind of transportation on March 22, 1961, the effective date of the Compact, it is entitled under the statute to the certificate it seeks, since its grandfather application was timely filed.
 
 
 4
 In 1957 one Walter L. Davis started a sightseeing operation in the Washington area, called 'Holiday Tours.' In November, 1959, this operation was taken over and conducted thereafter by Holidays Tours, Inc., a newly-formed corporation with Davis as its president and major stockholder. That corporation will hereinafter be referred to as the 'applicant,' and that term will include the predecessor Davis operation if the activities described occurred prior to November, 1959.
 
 
 5
 Prior to and on March 22, 1961, the applicant's principal place of business was in Bethesda, Maryland, with other offices for sale of tickets for its sightseeing tours in the Fairfax Hotel in Washington, D.C., and at the Holiday Inn, Arlington, Virginia. As indicated in a brochure attached to the application, which was in use in March, 1961,[2] four types of tours were offered 'by Cadillac Limousine or Air-Conditioned Coach,' each following a designated pattern, visiting designated buildings and sites, and carrying a set charge therefor. However, if a prospective patron did not wish to take one of the packaged tours or desired variations from it, the applicant offered its limousines for sightseeing on an hourly basis.
 
 
 6
 On March 22, 1961, the applicant owned three Cadillac limousines which were licensed in the District of Columbia to carry more than eight passengers.[3] These were designed to seat eight or less passengers, excluding the driver, although they could seat up to eleven passengers and apparently were so used on occasion. Prior to and on March 22, 1961, when persons in excess of the seating capacity of its limousines purchased tickets for its tours, the applicant rented or chartered a bus. The occasions on which buses were used fell generally only in the busy period from April through September. The record shows that an individual trading as Suburban Transit Company rented a bus to the applicant on one occasion in 1958 and on at least 10 or 12 occasions in 1959. The applicant furnished its own bus driver and licensed guide-lecturer on these occasions.
 
 
 7
 During 1960 the applicant secured for its tours the use of air-conditioned buses seating 29, 41, and 45 passengers from Atwood's Transport Lines. It also used Atwood buses, as well as buses of other companies, in 1961 when the occasion arose.[4] In the beginning Atwood supplied a driver with the bus, and the applicant provided a licensed guide-lecturer to accompany the tour group on the bus. Later, after the driver furnished by Atwood had been instructed and had become familiar with the applicant's method of operating its tours and with its routes and schedules, that driver was used as the guide-lecturer on the bus. The applicant paid Atwood an additional amount for the driver's services as guide-lecturer. All these tours were sold as 'HOLIDAY TOURS' AND TICKETS WERE ISSUED In tHat namE, although the buses used did not bear that marking.
 
 
 8
 The Commission found in its initial opinion that
 
 
 9
 'the transportation performed in buses was that of the carriers or owners of the vehicles and not that of the applicant, and that applicant's role was solely that of a broker and/or salesman.'
 
 
 10
 In its opinion on reconsideration the Commission said:
 
 
 11
 'The Commission is of the opinion and finds that Holiday Tours was not bona fide engaged in bus operations. The bus operations can only be classified as being that of the common carriers, chartered by Holiday Tours to transport the people for whom it had arranged the transportation. The Commission recognizes that the practice of limousine operators chartering buses is widespread throughout the industry. However, there is no evidence to prove that applicant held itself out to engage in bus service. None of its advertising makes this claim, nor did it attempt to secure the necessary certificates from the appropriate authorities. The buses utilized were marked and painted in the scheme of the common carriers and applicant posted no signs thereon to indicate that the buses were under its direction and control. The utilization of guides on vehicles driven by drivers unfamiliar with the wishes of Holiday Tours is not conclusive nor even persuasive when all the circumstances are considered. We can place little credence on the testimony that the Interstate Commerce Commission advised applicant that it did not need a certificate prior to rendering bus service. The Warrenner decision in 1958 (77 MCC 213) and the A.B. & W. vs. D.C. Transit System, Inc., decision in 1960 (83 MCC 547) renders such testimony entirely inconsistent with official decisions of the Interstate Commerce Commission. We conclude that the bus operations were charter services rendered by the common carriers, i.e. the transportation of persons arranged by someone (Holiday) other than the carrier.'
 
 
 12
 1. The applicant first argues that, in reaching its conclusion that the applicant on the determinative date was not bona fide engaged in transporting passengers by bus in round trip sightseeing or pleasure tours in the Washington area, the Commission erred in considering the facts that it did not own the buses used in transporting the persons who bought tickets for its tours and that it did not hold operating certificates from Federal and state authorities on March 22, 1961. We think such facts could properly be considered by the Commission, along with all other relevant factors, in arriving at its ultimate conclusion.[5]
 
 
 13
 2. The applicant attacks the factual conclusion of the Commission that the bus transportation was not performed by it as unwarranted by the record. With respect to rented or chartered equipment, we think the proper rule is, in line with that applied under the Motor Carrier Act of 1935, as amended, 49 U.S.C. 306 (Supp. V, 1959-60),[6] that the applicant seeking a grandfather certificate under the Compact must show that it controlled and directed the bus transportation to such an extent as to make it responsible to the passengers and to the public for the operations.
 
 
 14
 While we cannot properly direct the Commission to make a particular finding, we can and will return the case to it for reconsideration of its factual conclusion in the light of the rule set out above and all the factors bearing thereon. In its reconsideration the Commission should make findings as to whether the applicant sold the sightseeing tours carried by bus in its own name and issued its own tickets therefor, as to whether the tickets were sold on an individual basis for the tours, as to whether the bus drivers (and the tour passengers) were required to conform to the routes, the stops, the timing, the buildings and sites to be visited, and other details as established and directed by the applicant, as to the applicant's responsibility to the tour group and to the public for the tour transportation and operations, and as to any other factor deemed relevant. Among these we think should be whether and to what extent a guide-lecturer was provided by the applicant for the tours,[7] and whether the applicant was alone responsible to the tour group for provision of the transportation for the tours.
 
 
 15
 In this connection also consideration should be given and findings made as to whether the applicant would have been responsible to the tour passengers for negligent operation of the bus and for a failure to conduct the tour as outlined in the brochure; and whether the chartering bus company was serving the public directly or was merely an instrument performing a part of a sightseeing transportation service offered by the applicant. Cf. United States v. Rosenblum Truck Lines, 315 U.S. 50, 54, 62 S.Ct. 445, 86 L.Ed. 671, (1942).
 
 
 16
 We note also that the issue of whether or not the applicant controlled and directed the operations is not to be determined exclusively by the circumstances that the buses carried the markings of the owner and that the applicant posted no signs on the buses to indicate that they were under its direction or control, although such matters may properly be considered along with all other relevant factors. In this connection we note further that the Commission may well wish to correct its statement that none of the applicant's advertising makes the claim that the applicant held itself out to transport its tour groups by bus. Its brochure, said without contradiction to be in use on March 22, 1961, offered its tours with transportation by limousine or 'air-conditioned coach.'
 
 
 17
 3. The conclusion that the bus sightseeing operations on the critical date were not bona fide must also be reconsidered.
 
 
 18
 The only reason stated by the Commission for finding against the bona fides of the bus operations[8] was that, in view of reported decisions of the Interstate Commerce Commission, it did not credit testimony that an employee of that Commission advised applicant that it did not need a certificate prior to rendering bus service. But the mere fact that the applicant may have engaged in bus operations without a required certificate is not necessarily conclusive of its lack of good faith. As we recently pointed out in Warrenner v. Washington Metropolitan Area Transit Commission, 120 U.S.App.D.C. 355, 346 F.2d 836 (1965), an operation, although lacking in formal legal authority, may still be conducted in good faith for purposes of establishing grandfather rights. And, as we said, the Commission is to make the factual determinations, not on the basis of legal technicalities, but on such things as 'the absence of evasiveness and of deliberate and knowing disregard of the requirements of the law.' In this case the Commission should consider and make findings inter alia as to whether the bus operations were openly conducted without attempts at concealment or disguise and in such a manner as to indicate a real intention to offer and conduct a bus sightseeing operation, and whether the applicant intended to comply or believed that it had complied with all applicable Federal and state law. Cf. Alton R. Co. v. United States, 315 U.S. 15, 23-24, 62 S.Ct. 432, 86 L.Ed. 586 (1942); Slagle Contract Carrier Application, 2 M.C.C. 127, 142 (1937).
 
 
 19
 4. We find no merit in the other points raised on appeal by the applicant. We do not read the Commission's orders, insofar as they relate to the bus operations, as denying the application for grandfather rights because the applicant was not considered to be fit to have them. Nor can we say that the Commission abused its discretion in allowing parties having an interest in the proceeding to intervene therein, or in giving public notice of the application, or in ruling out detailed evidence as to the applicant's operations subsequent to March 22, 1961, the effective date of the Compact and the date fixed for determination of grandfather status. This is not to say, of course, that evidence subsequent to, but near in point of time to, that date might not properly be received, but the essential inquiry under Section 4(a) of the Compact must necessarily relate to the applicant's operations prior to and on that date, not those after that date. Nor do we think it was error to decline to admit Exhibits 5 and 6, consisting of correspondence initiated on June 7, 1961, as evidence to show the applicant's bona fides as of March 22, 1961.
 
 
 20
 The orders under review are set aside and the case is remanded to the Commission for further appropriate proceedings in accordance with this opinion.
 
 
 21
 So ordered.
 
 
 
 [1]
 This provides:
 '4. (a) No person shall engage in transportation subject to this Act unless there is in force a certificate of public convenience and necessity issued by the Commission authorizing such person to engage in such transportation; provided, however, that if any person was bona fide engaged in transportation subject to this Act on the effective date of this Act, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within 90 days after the effective date of this Act. Pending the determination of any such application, the continuance of such operation shall be lawful.'
 
 
 [2]
 Davis so testified. He also testified that this brochure was placed in all the Holiday Inns over the country and that it was distributed by the Maryland Travel Council and the Virginia Travel Council, in both of which the applicant was a member. There is no evidence to the contrary
 
 
 [3]
 They were also apparently so licensed in Maryland and Virginia
 
 
 [4]
 The Commission made no finding as to the number of times tours were operated by bus during 1960 or as to the general volume of the applicant's business at any time. The record contains evidence tending to show, however, that buses were used on a substantial number of occasions during 1960. The first three months of 1961 fell in the slow season for sightseeing when buses were not generally used. but evidence was tendered to indicate that buses were used in April, 1961, and later months in that year
 
 
 [5]
 'In ascertaining the rights of an applicant under the 'grandfather' clause, many elements must be considered. The bona fides of the operation, the regularity and extent of the operation, the equipment in use, whether owned or leased, the applicant's control or lack of control over the operators and equipment, the relationship existing between applicant and operator, the lawfulness of the operations in the different states, and the applicant's responsibility to the public and shipper, are all matters which should be inquired into and appraised.' Moore v. United States, 41 F.Supp. 786, at 791 (D.Minn.1941), aff'd, 316 U.S. 642, 62 S.Ct. 1036, 86 L.Ed. 1128 (1942)
 
 
 [6]
 Loving v. United States, 32 F.Supp. 464, 466 (W.D.Okla.), aff'd, 310 U.S. 609, 60 S.Ct. 898, 84 L.Ed. 1387 (1940); Moore v. United States, supra note 5, 41 F.Supp. at 792; Thomson v. United States, 321 U.S. 19, 24-25, 64 S.Ct. 392, 88 L.Ed. 513 (1944); O'Malley v. United States, 38 F.Supp. 1 (D.Minn.1941); Kline v. United States, 41 F.Supp. 577 (D.Neb.1941). Cf. Allied Van Lines v. Maltbie, 265 App.Div. 979, 38 N.Y.S.2d 617 (1942), leave to app. denied, 266 App.Div. 700, 41 N.Y.S.2d 222 (1943)
 
 
 [7]
 The guide-lecturer might well be deemed to be applicant's guide-lecturer, even after the applicant used the Atwood bus driver as guide-lecturer. There was evidence that the driver was trained by the applicant and followed its instructions and schedules; and that although he was not paid directly by the applicant for this service, the applicant did pay an amount to the bus owner for his services in this respect
 
 
 [8]
 As distinguished from the bona fides of the applicant's limousine tour operations when more than six or seven passengers, exclusive of the driver, were carried. The applicant has made no argument with respect to the findings relating to the limousine operations